**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1341**

NAVY FEDERAL CREDIT UNION,

Plaintiff – Appellant,

v.

LTD FINANCIAL SERVICES, LP; ADVANTAGE ASSETS II, INC.; DEBT MANAGEMENT PARTNERS, LLC; JOHN DOES #1 - #3; BAYVIEW SOLUTIONS LLC,

Defendants – Appellees.

------------------------------

CREDIT UNION NATIONAL ASSOCIATION; NATIONAL ASSOCIATION OF FEDERALLY-INSURED CREDIT UNIONS,

Amici Supporting Appellant.

Appeal from United States District Court for the Eastern District of Virginia, at Alexandria. Anthony J. Trenga, District Judge. (1:18-cv-01424-AJT-TCB)

Argued: April 7, 2020                                         Decided: August 20, 2020

Before WILKINSON and RICHARDSON, Circuit Judges, and Thomas E. JOHNSTON, Chief United States District Judge for the Southern District of West Virginia, sitting by designation.

Reversed by published opinion. Judge Richardson wrote the opinion, in which Judge Wilkinson and Judge Johnston join.

––––––––––––––––

**ARGUED:** Michael Julian Gottlieb, WILLKIE, FARR & GALLAGHER LLP, Washington, D.C., for Appellant. Virginia Whitner Hoptman, REDMOND, PEYTON & BRASWELL, Alexandria, Virginia; David E. Gutowski, ZDARSKY SAWICKI & AGOSTINELLI, Buffalo, New York, for Appellees. **ON BRIEF:** Joshua Riley, Jon R. Knight, BOIES SCHILLER FLEXNER LLP, Washington, D.C., for Appellant. James S. Kurz, REDMOND, PEYTON & BRASWELL, Alexandria, Virginia; J. William Eshelman, III, Bradford G. Hughes, CLARK HILL PLC, Washington, D.C., for Appellees. Michael H. Pryor, Washington, D.C., Christine A. Samsel, Nicholas R. Santucci, BROWNSTEIN HYATT FARBER SCHRECK, LLP, Denver, Colorado, for Amicus Credit Union National Association. William M. Jay, Andrew Kim, GOODWIN PROCTER LLP, Washington, D.C., for Amicus National Association of Federally-Insured Credit Unions.

RICHARDSON, Circuit Judge:

This appeal centers on the meaning of a seemingly simple, three-letter word connecting two clauses: *and*. For establishing diversity jurisdiction, Congress provides that a corporation "shall be deemed a citizen of every State and foreign state by which it has been incorporated *and* of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1) (emphasis added). We regularly apply this subsection to your bread-and-butter, *state*-chartered corporations. But *federally* chartered corporations (not incorporated in a State or foreign state) do not "fit comfortably" under the first clause. *Wachovia Bank v. Schmidt*, 546 U.S. 303, 306 (2006). What of the second?

According to defendants and the district court, a federal corporation is not a citizen of the place where it has its principal place of business under § 1332(c)(1). In their view, the use of the word *and* between the clauses means that § 1332(c)(1) applies *only* to those corporations that satisfy both: those chartered by a "State or foreign state," not by the federal government. Plaintiff Navy Federal Credit Union, a federally chartered credit union, disagrees. Acknowledging the first clause of § 1332(c)(1) does not grant state citizenship to a federal corporation, Navy Federal argues the second clause deems it a citizen of Virginia.

In our view, § 1332(c)(1)'s text, structure, and context show that Navy Federal is correct. The plain meaning of *and* in context here is 'in addition to,' and when we add something to nothing, something remains. Section 1332(c)(1) thus requires us to interpret *and* to give effect to the second clause even when the first clause does not specify a citizenship. Moreover, the district court's and defendants' understanding of *and* conflicts

3

with circuit precedent. *See Athena Automotive, Inc. v. DiGregorio*, 166 F.3d 288, 290 (4th Cir. 1999). Finally, this approach to § 1332(c)(1) is supported by the Supreme Court's holding in *Bankers Trust Co. v. Texas & Pacific Railway Co.*, 241 U.S. 295 (1916). There, the Court asked whether the common law, the constitution, or the legislature spoke to the issue of corporate citizenship. But with no existing constitutional or legislative provision on point, the Court found a federal corporation not diverse under then-existing federal-common-law rules. *Id.* at 309−10. Congress has since plainly provided a general rule for corporate citizenship, and that text grants a federal corporation the citizenship of its principal place of business. For these reasons, we find Navy Federal to be a citizen of Virginia, and we reverse.

## I.    Background

This case arises from a contract dispute. In April 2012, Plaintiff Navy Federal Credit Union sold a portfolio of debt instruments to defendant Advantage Assets II. Advantage then turned around and resold those assets to its codefendants. This resale ostensibly violated Advantage's asset-purchase agreement with Navy Federal. Adding insult to breach, the codefendants supposedly employed unscrupulous debt-collection practices that defamed the credit union, interfered with its business, and injured its members.

So Navy Federal filed this lawsuit in federal district court, asserting only state-law claims and invoking diversity jurisdiction. The substance of Navy Federal's claims is not at issue today. Rather, this appeal concerns the federal courts' jurisdiction over the controversy in the first place. Defendants' citizenship—Delaware, Florida, New York, and

4

Texas—is uncontested. And Navy Federal is seeking damages above the jurisdictional minimum. *See* § 1332(a). The primary issue here is whether Navy Federal, as a federally chartered credit union, is a citizen of any state.

## A.    Navy Federal Credit Union

Navy Federal Credit Union is a federally chartered, not-for-profit credit union. On July 17, 1947, the Bureau of Federal Credit Unions issued a certificate of incorporation to the "Navy Department Employees Federal Credit Union" under the Federal Credit Union Act of 1934. At the time of its incorporation, the credit union limited its membership to "military personnel [and employees] of the Navy Department in Washington, D.C. and adjoining counties of Maryland and Virginia," as well as employees of the credit union and their families. J.A. 100. And at first, the credit union ran its operations from Washington, D.C.

Over the next seventy years, the credit union experienced explosive growth. Navy Federal now has over eight-million members in thirty states, the District of Columbia, two U.S. territories, and twelve foreign countries. All "[m]ilitary and civilian personnel regularly employed by the Department of Defense[, Coast Guard, or National Guard] . . . at any Government installation, facility, or unit, afloat or ashore" may join the credit union today. J.A. 104. Additionally, several idiosyncratic constituencies scattered across the

5

country have since become eligible for membership.[1] As of December 2017, Navy Federal had accumulated over $63 billion in shares and member deposits.

Completing the transformation, the "Navy Department Employees Federal Credit Union" eventually shortened its name to "Navy Federal" and moved its corporate headquarters to Vienna, Virginia (nearby the Pentagon). This Vienna complex is home to 20 out of 21 executives serving on the Credit Union's management committee. It is where Navy Federal's directors and officers meet and where all of its operations (except customer service) are managed. Most of the credit union's branches and members are located outside of Virginia, and a plurality of its employees now live and work in Florida.

## B.     Proceedings below

After Navy Federal initiated this suit in federal court, one defendant, Debt Management Partners, moved to dismiss it for lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). It argued that Navy Federal is not diverse under § 1332, so the district court lacked federal-diversity jurisdiction. And with no other grounds for federal jurisdiction, the case must be dismissed. *See generally Northern Virginia Foot & Ankle Assocs., LLC v. Pentagon Federal Credit Union*, No. 10-cv-1640-RWT, 2011 WL 280983 (D. Md. Jan. 26, 2011).

---

[1] *See, e.g.*, J.A. 104–121 (Voting members of Elsinore Women's Club in Lake Elsinore, California; Employees of Inspire Kitchen and Bath in National City, California; employees of the United States Congress who work in San Diego County, California; Members of Serra High Football Boosters in San Diego, California; Employees of Jenks Holdings in Las Vegas, Nevada; and Employees of Share Computing in San Diego, California).

The district court agreed. *See Navy Federal Credit Union v. LTD Financial Services, LP*, 368 F. Supp. 3d 889, 900 (E.D. Va. 2019). First, the court reasoned that federal credit unions are, in fact, corporations under the plain language of the Federal Credit Union Act ("FCUA"). *See id.* at 894. But the court found that § 1332(c)(1), in which Congress provides for the citizenship of corporations, does not apply to *federal* corporations. The district court reasoned that § 1332(c)(1) "states that a corporation is a citizen of the state in which it was incorporated *and* in which it has its principal place of business[, so] [t]he use of the word 'and' between the clauses . . . suggests that the provision contemplates only those corporations that have both, i.e., those chartered under state law." *Id.* And since Navy Federal was chartered under federal law, the district court held that § 1332(c)(1) does not apply, meaning Navy Federal was not diverse. *See id.* at 898.[2] Thus the court dismissed the case for lack of subject-matter jurisdiction.

Navy Federal timely appealed, and we have jurisdiction. *See* 28 U.S.C. § 1291.[3]

---

[2] The district court also considered, and rejected, the so-called "localization exception." *Navy Federal Credit Union*, 368 F. Supp. 3d at 898–900 (discussing *Feuchtwanger Corp. v. Lake Hiawatha Fed. Credit Union*, 272 F.2d 453 (3d Cir. 1959)). Since we find Navy Federal to be diverse under § 1332, we decline to pass on the validity of this supposed exception.

[3] The question on appeal is whether § 1332(c)(1) applies at all. Defendants do not contest that if § 1332(c)(1) provides that Navy Federal is a citizen of its principal place of business, then that place would be Virginia. *See, e.g.*, J.A. 25; *see also* Dist Ct. Dkt. 149 at 9, 10, 19; *Navy Fed. Credit Union*, 368 F. Supp. 3d at 891.

**II. Discussion**

We review de novo the district court's determination that it lacked subject-matter jurisdiction for lack of diversity. *Elliott v. American States Insurance Co.*, 883 F.3d 384, 394 (4th Cir. 2018).

The judicial Power of the inferior federal courts extends only as far as Article III permits and Congress chooses to confer. *See* U.S. Const. Art. III, § 1, cl. 2; *Sheldon v. Sill*, 49 U.S. 441, 448–49 (1850); *cf. Martin v. Hunter's Lessee*, 14 U.S. 304, 328–31 (1816). Among the several constitutional bases for jurisdiction, Article III § 2 permits courts to decide "Controversies . . . between Citizens of different States." Christened "diversity jurisdiction," this constitutional font allows for the judicial Power to flow where the citizenship of any plaintiff differs from that of any defendant. *See State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 531 (1967). This we call "'minimal diversity.'" *Id.* at 530.

But Congress (so far) has declined to extend federal-diversity jurisdiction to this constitutional limit. As relevant here, § 1332(a) allows us to exercise diversity jurisdiction when two requirements are satisfied. First, the "matter in controversy" must "exceed[] the sum or value of $75,000." § 1332(a). And second, the controversy must arise between "citizens of different States." § 1332(a)(1); *see also* § 1332(a)(2)–(4) (governing suits that involve citizens of foreign states).

This appeal involves the latter requirement of § 1332(a). Unlike the constitutionally permitted "minimal diversity" jurisdiction, diversity must be "complete" to satisfy this Congressional grant. *See Strawbridge v. Curtiss*, 7 U.S. 267 (1806). This means that no

8

plaintiff may share a citizenship with any defendant. *See id.* Moreover, to be "*citizens* of different States" (or a foreign state), all parties must have a state (or foreign) citizenship in the first place. *See* § 1332(a)(2)–(3) (emphasis added).[4] And so "stateless" individuals (or corporations) may destroy diversity jurisdiction. *See, e.g.*, *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 829 (1989). Because of this "complete diversity" rule, a federal court must determine and compare the citizenship(s) of all plaintiffs and all defendants before exercising diversity jurisdiction under § 1332(a).

Of course, this only dodges the question of *how* a court is to determine the citizenship of the parties before it—particularly when one of those parties is an artificial entity. At common law, this question was a difficult one, and it has a long, conflicted, and contentious history. *See Hertz Corp. v. Friend*, 559 U.S. 77, 84–88 (2010). But ultimately, "how such citizenship is to be determined, and what if any related rules ought to apply, are decisions . . . suited to the legislat[ure]." *United Steelworkers of America, AFL-CIO v. R. H. Bouligny, Inc.*, 382 U.S. 145, 153 (1965).

Congress has decided. Section 1332(c)(1) specifies the rules governing the citizenship of corporations. It provides:

> "[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business."

---

[4] We note that, for assessing diversity jurisdiction, the term "citizenship" diverges from its meaning in the immigration or passport context. *See generally Gilbert v. David*, 235 U.S. 561, 569 (1915) (discussing the concept of one's domicile); 13E Wright & Miller, Federal Practice and Procedure § 3611, *The Requirement and Meaning of Citizenship—In General* (3d ed. 2008). This distinction is not at issue today.

§ 1332(c)(1). Here, we ask whether (and later how) this text applies to Navy Federal, a federally chartered credit union.

Defendants argue that § 1332(c)(1) cannot apply to Navy Federal in three thrusts. First, they urge that a federal *credit union* is not a *corporation*, so different rules apply. Second, defendants assert that since the first clause of § 1332(c)(1) *does not* apply to Navy Federal, the second clause *cannot* apply. Thus, Navy Federal is stateless, and its stateless status destroys diversity. Below, the district court based its holding on this second argument. Third, they argue that the Supreme Court's decision in *Bankers' Trust Co. v. Texas & Pacific Railway Co.*, 241 U.S. 295 (1916)—holding federal corporations are not diverse without some common law, constitutional, or statutory indication to the contrary—should control our decision today.

Navy Federal responds in three corresponding parries. According to Navy Federal, the statute creating federal credit unions classifies them as "corporations," meaning § 1332(c)(1) applies. Next, Navy Federal argues that the plain meaning of the word *and* shows that the second clause of § 1332(c)(1) provides a basis for citizenship independent of the first clause. Last, Navy Federal accepts the *Bankers' Trust* precedent and argues that—consistent with the Supreme Court's instructions—we must give effect to Congress's since-provided rule in § 1332(c)(1) for conferring state citizenship on corporations.

We consider each engagement and find that Navy Federal wins the bout: Navy Federal is a citizen of its principal place of business, Virginia.

### A. Navy Federal is a corporation

We first consider whether Navy Federal is a "corporation." Section 1332(c)(1) governs the citizenship of only "true-blue 'corporations.'" *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 223 (4th Cir. 2019); *see* § 1332(c)(1) ("*a corporation* shall be deemed . . .") (emphasis added). If an unincorporated association, as defendants claim, then different rules would apply to Navy Federal: An unincorporated association is imbued with the citizenship of all its members. *See, e.g.*, *Americold Realty Trust v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1015 (2016); *Chapman v. Barney*, 129 U.S. 677, 682 (1889). And because Navy Federal's members include citizens of Florida, Texas, Delaware, and New York—where defendants are also citizens—applying the unincorporated association rule here would defeat complete diversity and thus deprive the federal courts of jurisdiction.

To determine whether an entity is a "corporation" we look to the statute of its formation to see if it is designated as such. *See Carden v. Arkoma Associates*, 494 U.S. 185, 189–90 (1990); *Hawkins*, 935 F.3d at 223.[5] And so the district court began its analysis quite properly, by looking to the plain text of the FCUA, 12 U.S.C. § 1751 *et seq*. The FCUA specifies that, upon approval, a federal credit union "shall be a body corporate." *Id.*

---

[5] Only in special circumstances—such as when a foreign corporation lacks a clear domestic analogue—may we look to the structure of an entity to determine whether it classifies as a corporation. *See People of Puerto Rico v. Russell & Co., Sucesores S. En. C.*, 288 U.S. 476, 479−80 (1933) (analyzing a *sociedad en comandita* (a Puerto Rican business entity that has some features of a corporation)); *see also Hawkins*, 935 F.3d at 224–25 (discussing *BouMatic, LLC v. Idento Operations, BV*, 759 F.3d 790, 791 (7th Cir. 2014)). Defendants do not assert that special circumstances exist here.

§ 1754; *accord* 12 C.F.R. Part 701, App. A (an approved federal credit union is a "corporation chartered under the laws of the United States"); *Corporation*, 3 Oxford English Dictionary 956 (2d ed. 1989) ("*A body corporate* legally authorized to act as a single individual") (emphasis added).  And upon becoming a "body corporate," a federal credit union is "vested with all of the powers and charged with all the liabilities conferred . . . by [the FCUA] upon *corporations* organized hereunder."  12 U.S.C. § 1754 (emphasis added).  Thus the FCUA explicitly states that federally chartered credit unions are, in fact, corporations.  Context clues confirm this understanding:  A credit union's powers and governance structure must be set forth in an "organization certificate," which serves as "the charter of the *corporation*."  *Id*. (emphasis added).  Congress has classified federal credit unions as "corporations," not unincorporated associations.

Defendants instead highlight other provisions of the FCUA that use the term "association."  *See, e.g.*, *id.* § 1752 ("the term 'Federal credit union' means a cooperative association organized in accordance with the provisions of this chapter").[6]  Supposedly, the use of the word "association" shows that federal credit unions are unincorporated.  This argument suffers from two flaws.

---

[6] Defendants also look for support in *First Nat'l Bank & Tr. Co. v. Nat'l Credit Union Admin.*, 90 F.3d 525 (D.C. Cir. 1996), *aff'd,* 522 U.S. 479 (1998).  The question in that case was "whether the members of an occupational [Federal Credit Union] must all share a single 'common bond of occupation,'" or whether membership may be drawn from unrelated groups.  *Id*. at 526.  In using the word "association," the D.C. Circuit simply described the common bond requirement—and nowhere did it discuss or suggest whether a federal credit union is a corporation.

12

First, defendants miss the point—the relevant line is between incorporated and unincorporated entities, not "associations" and "corporations." *See Hawkins*, 935 F.3d at 222 ("Different rules apply for corporations and *unincorporated* associations.") (emphasis added). An "association" merely signifies a group of persons, not how that group is organized. *See* "The Dictionary Act," 1 U.S.C. § 5 (The word "association" may be used "in reference to a corporation."); *Association*, 1 Oxford English Dictionary 718 ("A body of persons who have combined to execute a common purpose or advance a common cause; the whole organization which they form to effect their purpose."). For instance, the Home Owners' Loan Act classifies "Federal savings associations" as corporations—despite the use of the word "association" in their name, *see* 12 U.S.C. § 1464(a)(1)–(2), (d)(5). Thus the mere use of the term "association" in the FCUA—without more—does not at all suggest that Congress intended for federal credit unions to be *unincorporated* entities.

Second, even if *association* could generally be read to imply an *unincorporated* entity, defendants ignore the context in which the word "association" is used. *See, e.g.*, *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 569–70 (2012) (defining the word "interpreter" based on its statutory context). The FCUA uses the term "association" to describe the characteristics of those groups eligible to incorporate as a federal credit union. *See* 12 U.S.C. § 1759(b)(1)−(2) (A federal credit union "shall be limited to . . . group[s] having a common bond of occupation or association."); *National Credit Union Administration v. First National Bank & Trust Co.*, 522 U.S. 479, 484 (1998) (discussing the common bond requirement); *cf.* 8 Del. Code § 101 ("Any person, partnership, *association* or corporation . . . *may incorporate*.") (emphasis added). Section 1753 requires

13

an "association" of "seven or more natural persons" as a prerequisite to form a credit union. So an *individual* alone cannot incorporate, he must be part of a *group or association*. And that gang of (at least) seven must then specify "the name of [their] association" in an "organization certificate" that serves as an application to form their credit union. *Id.* Once the National Credit Union Administration Board determines "whether the organization certificate conforms to the provisions of this chapter" (among other factors), the Board approves the association's organization certificate, and that certificate becomes "the charter of the *corporation*." *Id.* § 1754 (emphasis added). Thus, we find the structure of the FCUA—requiring association as a prerequisite to incorporation—consistent with its plain classification of an approved credit union as "a body corporate." *Id.*[7]

For these reasons, we hold that a federal credit union is a "corporation" and so turn to the application of § 1332(c)(1) to federal credit unions.

---

[7] Other courts have suggested that the word *corporation* in § 1332(c)(1) is at issue for a separate reason. In *Beaman v. Mountain Am. Fed. Credit Union*, No. 19-cv-00053-HCN, ---- F. Supp. 3d ----, 2020 WL 2085266, at *5 (D. Utah Apr. 30, 2020), the district court reasoned that *corporation* is implicitly limited to entities incorporated by a State or foreign state. We see no basis for reading this limitation into *corporation*. In fact, we think this reading of § 1332(c)(1) puts the cart before the horse. "State" and "foreign state," following the preposition "of," modify the object "citizen," and thus specify the types of citizenships that § 1332(c)(1) confers on "corporations." They do not impose an ex-ante limitation upon the kinds of corporations to which citizenship may be conferred.

### B. Navy Federal is a citizen of the state of its principal place of business

### 1. Text, structure, and precedent support Navy Federal

"As in all statutory construction cases," we start with the plain text of the provision. *Marx v. General Revenue Corp.*, 568 U.S. 371, 376 (2013). Section 1332(c)(1) states: "[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." By its own terms, § 1332(c)(1) offers two grounds for corporate citizenship— a corporation is (1) a citizen "of every State and foreign state by which it has been incorporated" *and* (2) a citizen "of the State or foreign state where it has its principal place of business." § 1332(c)(1).[8] And the use of the mandatory "shall" requires us to deem a corporation a citizen on the specified grounds where possible. *Holland v. Pardee Coal Co.*, 269 F.3d 424, 431 (4th Cir. 2001). The first clause cannot grant Navy Federal a State citizenship as it is *federally* incorporated, but the second confers Navy Federal with the citizenship of Virginia, its principal place of business. We see no problem with this straightforward interpretation.

'Not so fast,' defendants protest. Supposedly, an interpretive problem arises from the word that connects the two clauses: *and*. According to defendants, *and* means "along

---

[8] The parties refer to the relevant language of § 1332(c)(1) as "clauses"—as did the district court and as have commentators. *See, e.g.*, *Navy Federal Credit Union*, 368 F. Supp. 3d at 894; Marc Miller, *Diversity Jurisdiction Over Alien Corporations*, 50 CHI. L. REV. 1458, 1467 (1983). But the most accurate grammatical description for each of these sets of words we think to be more nuanced. *See Chicago Manual of Style* § 5.176 (17th ed. 2017). Yet, for the sake of consistency and simplicity—and because nothing here turns on the characterization—we adopt the terminology advanced by the parties.

with." And in this conjunctive sense, it means two items to be "taken jointly." Appellees Br. 13; *see also* J.A. 332. In defendants' view, this creates a problem. If applying the state-of-incorporation clause yields a null set, there is nothing for the principal-place-of-business clause to go "along with." So it just cannot be applied. Navy Federal counters that *and* simply signifies "'in addition to.'" Appellant Br. 12. And there is no problem with adding to a null set: zero plus one is one. This dispute requires us to bring our normal tools of statutory construction to bear on this simple conjunction.

We first look to the "'ordinary or natural meaning'" of a term in dispute—a "cardinal principle of statutory construction." *United States v. Mills*, 485 F.3d 219, 222 (4th Cir. 2007) (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)). Although the ordinary meaning of a word normally aligns with its dictionary definition, *see Blakely v. Wards*, 738 F.3d 607, 611 (4th Cir. 2013) (en banc), this general rule offers less guidance when applied to a word like *and*. *And* is an "elemental word[] in the English language" used to "combine items." Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012); *see also* Bob Dorough, *Conjunction Junction* in *Schoolhouse Rock!* (1973). But *and* alone tells us little of *how* two items are to be combined.

Dictionaries do little to resolve the dispute. In fact, the parties here both find support in the very same definition. *See And*, 1 Oxford English Dictionary 449 ("Introducing a word, phrase, clause, or sentence, which is to be taken side by side with, *along with*, or *in addition to*, that which precedes it.") (emphasis added). Accordingly, we think *and*—as a word with "many dictionary definitions" (the Oxford dictionary alone lists over thirty, *see* 1 Oxford English Dictionary 449–50)—"must draw its meaning from its context."

16

*Ardestani v. I.N.S.*, 502 U.S. 129, 135 (1991); *see also* Kenneth A. Adams & Alan S. Kaye, *Revisiting the Ambiguity of "And" and "Or" in Legal Drafting*, 80 ST. JOHN'S L. REV. 1167, 1172 ("[W]hether *and* is ambiguous, and in what way, depends entirely on the grammatical context."). The Supreme Court labels words of this nature "chameleons"— that is, the color of their surroundings determines their character. *See Kucana v. Holder*, 558 U.S. 233, 245 (2010) (discussing the word *under*); *see also Shaw v. National Union Fire Insurance Co.*, 605 F.3d 1250, 1253 (11th Cir. 2010) (discussing *and*); *Peacock v. Lubbock Compress Co.*, 252 F.2d 892, 893 (5th Cir. 1958) (same). Thus, the parties' "diverse renderings of [*and*], standing alone, do not equip us to resolve this case," *Kucana*, 558 U.S. at 245, so we home in on "the specific context in which [*and*] is used, and the broader context of the statute as a whole," *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

Three structural and contextual features of § 1332(c)(1) confirm Navy Federal's interpretation of *and*. First, we note the structural independence of § 1332(c)(1)'s two clauses. Each provides a different basis for deeming a corporation a "citizen of" a jurisdiction. The parallel use of the preposition "of" confirms that both clauses (really, adjectival phrases) are directed toward the word "citizen," not one another. *See generally* Chicago Manual of Style § 5.176 (17th ed. 2017). So this structural independence suggests that these clauses operate independently to deem a corporation a citizen of a particular jurisdiction.

Second, the clauses' logical independence confirms their structural independence. Suppose a parent tells his child, "Today, we will go to the park and to the zoo." It turns

17

out, however, that when the pair arrives at the first destination, the park is closed.  Do they proceed to the still-open zoo?  We think it clear they do.  That the park was closed has no bearing on their also-expressed intention to go to the zoo.  In this context, Navy Federal's interpretation of *and* carries the day.  Consider, on the other hand, the scenario where the zoo is in the park.  *Compare* Central Park Zoo, NY (in Central Park), *with* Riverbanks Zoo, Columbia, SC (near Riverfront Park).  Because the park is closed, the intention to visit the zoo is also defeated.  In this circumstance, defendants' interpretation of *and* prevails.  This simple example highlights the importance of the logical connection between two items connected by a conjunction.  When the objects connected are independent, they are generally taken "in addition."  *See* Reed Dickerson, *The Fundamentals of Legal Drafting* § 6.2, at 105 (2d ed. 1986).  When they are dependent, they must be taken "jointly."

Here, the state-of-incorporation clause and principal-place-of-business clause are logically independent:  the park is closed, but the zoo remains open.  It is a central feature of corporate law that firms may choose where to incorporate, and so select which State, federal, or foreign corporate law will govern them.  *See* Lucian A. Bebchuck and Alma Cohen, *Firms' Decisions Where to Incorporate* 46 J. L. & ECON. 383, 383 (2003) ("A central feature of the U.S. corporate environment is the presence of regulatory competition in corporate law."); *see also* Note, *OCC Allows Fintech Companies to Apply for National Bank Charters*, 132 HARV. L. REV. 1361, 1363–66 (2019) (discussing these considerations for FinTech companies); *cf. Agency for International Development v. Alliance for Open Society International, Inc.*, 140 S. Ct. 2082, 2087 (2020) ("Plaintiffs' foreign affiliates were incorporated in other countries and are legally separate from plaintiffs' American

18

organizations."). And a corporation's place of incorporation does not depend on the location of its headquarters—nor does the place of its headquarters turn on the location of its incorporation. *See, e.g.*, Model Bus. Corp. Act § 5.01(a) (2016); Yitzhak Hadari, *The Choice of National Law Applicable to the Multinational Enterprise and the Nationality of Such Enterprises*, 1974 DUKE L. J. 1, 10. We see no reason to read *and* here to create a conjunctive dependence where none structurally or logically exists.

Third, consider the way that *and* is used throughout § 1332(c). *See Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020) ("'In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning' across a statute.") (quoting *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019)). Although defendants ask us to condition the function of the second clause on the first, § 1332(c)(1) contains no qualifying language to support such a reading. The first clause itself uses the word *and*, providing that a corporation is a citizen "of every State *and* foreign state" where incorporated. § 1332(c)(1) (emphasis added). Of course, the use of *and* here supports only Navy Federal's usage. When *and* means "in addition to," a corporation may be a citizen of a domestic state, a foreign state, or both. But if *and* instead means "taken jointly," so that it contemplates only those corporations that have both, then the incorporation clause would apply only to those entities incorporated in *both* a State and foreign state.

The latter reading would destroy diversity jurisdiction as we know it: § 1332(c)(1) would apply only to entities incorporated both domestically and overseas—which, we feel safe to say, is not most corporations. No court, to our knowledge, has adopted such an illogical construction of that provision. And this flawed reading becomes particularly stark

19

when we recall that Congress only added the words "and foreign state" in 2011. *See* Federal Courts Jurisdiction and Venue Clarification Act of 2011, PL 112-63, 125 Stat 758. We doubt that this three-word addition can reasonably be read to dramatically curtail most corporate diversity jurisdiction as we know it. Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001).

*And* is also used in § 1332(c)(1) in reference to insurers—a usage that similarly supports Navy Federal's reading.[9] Section 1332 contains three bases for conferring citizenship on an insurer in an insurance lawsuit: (1) where the insured is a citizen, (2) where the insurer has been incorporated, *and* (3) where the insurer has its principal place of business. § 1332(c)(1)(A)–(C). Because these clauses apply "whether [an insurer is] incorporated or unincorporated," Navy Federal's reading of *and*, again, must apply here. If we were to adopt defendants' reading of *and*, the instruction to apply these clauses to unincorporated insurers would be self-defeating. Section 1332(c)(1)(B) ("every State and

---

[9] The rest of § 1332(c)(1) states:

[I]n any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of—
    (A) every State and foreign state of which the insured is a citizen;
    (B) every State and foreign state by which the insurer has been incorporated; *and*
    (C) the State or foreign state where the insurer has its principal place of business.

(emphasis added).

20

foreign state by which the insurer has been incorporated") yields only a null set for unincorporated associations, thus also precluding the application of § 1332(c)(1)(A) and (C) to unincorporated insurers. This result is nonsensical. For § 1332(c)(1) to apply to unincorporated insurers, as Congress has expressly instructed, we must invoke Navy Federal's interpretation of *and*. *See Fontenot v. Taser International, Inc.*, 736 F.3d 318, 327 (4th Cir. 2013) ("It is presumed that the legislature intended each portion to be given full effect and did not intend any provision to be mere surplusage.") (quotation marks and citations omitted).

In contrast, other provisions show that when Congress wishes to restrain a grant of citizenship, it uses words of limitation. *See, e.g.*, § 1332(c)(2) ("[T]he legal representative . . . shall be deemed to be a citizen *only of* . . .") (emphasis added). When Congress imposes a conjunctive requirement in other subsections (as defendants ask us to do here), it combines *and* with that language of limitation. So, in § 1332(a) for example, Congress uses the word "where" to specify that diversity jurisdiction exists only "where" both "A" *and* "B" are satisfied. *See also* § 1332(d)(2) ("in which" both "A" *and* "B"). But § 1332(c)(1) speaks in the language of conferral: "a corporation *shall be deemed* to be a citizen of [both] . . . ." *Id.* (emphasis added). And § 1332(c)(1) confers generously at that: "… *of every* State and foreign state . . . ." *Id.* (emphasis added). This distinction shows that Congress knew precisely how to impose conjunctive requirements but declined to do so here. And it is not for this court to write that restriction in.

21

For all these reasons, we find that *and* in § 1332(c)(1) must be interpreted as Navy Federal argues. The textual reading offered by defendants is simply implausible given § 1332(c)(1)'s text, structure, and context.

Defendant's reading also conflicts with our precedent. In *Athena Automotive, Inc.*, we considered how § 1332(c)(1) applied to determine the citizenship of an inactive corporation with no principal place of business. 166 F.3d at 290. In that case, Athena Automotive—a Georgia corporation—brought state-law claims in the District of Maryland against a Maryland resident and his Maryland corporation. The Maryland defendants sought to dismiss the suit for lack of diversity jurisdiction. We explained that because "Athena Automotive was unquestionably a citizen of Georgia, its state of incorporation . . . whether it also actually had a place of business at the commencement of this action is not a matter that we need to decide, since it did not have its principal place of business in Maryland." *Id.* at 292.[10]

The import of our *Athena Automotive* ruling is that a corporation may still be a citizen of the State of incorporation *even if it has no principal place of business* under § 1332. So although defendants' conjunctive requirement would violate this rule,

---

[10] *See also Midlantic Nat. Bank v. Hansen*, 48 F.3d 693, 696 (3d Cir. 1995) ("We conclude that as a general matter, an 'inactive' corporation (that is, a corporation conducting no business activities) has no principal place of business, and is instead a citizen of its state of incorporation only."); *Holston Investments, Inc. B.V.I. v. LanLogistics Corp.*, 677 F.3d 1068, 1071 (11th Cir. 2012) ("[W]e join the Third Circuit in holding a dissolved corporation has no principal place of business. . . . Under the rule we adopt today, LanLogistics is therefore only a citizen of Delaware, and this court has subject-matter jurisdiction.").

plaintiff's additive interpretation follows. Under the district court's contrary reading, Athena Automotive could not have been a citizen of Georgia unless we had also determined that it had a principal place of business *somewhere*. Thus, its reading cannot be correct.[11]

### 2. Defendants' statutory counterarguments fail

Defendants also object that Navy Federal's reading of § 1332(c)(1) violates the canon against superfluousness, *see Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012), and is precluded by negative implication, *see N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 940 (2017). Appellee Br. 22–25, 27–28. For both arguments, defendants look to the same sources: statutes where Congress has conferred state citizenship on other federal corporations. First, we disagree with the premise—the statutes identified trigger neither canon. And second, even if they did, Congress has spoken with sufficient clarity to overcome those canons here.

---

[11] To avoid *Athena Automotive*, defendants seem to abandon the district court's "taken together" reading and suggest a "two-step" reading of § 1332(c)(1). In the first step, they urge us to ask whether an entity is incorporated in a State or foreign state. If not, we stop—the corporation is not a citizen of any State or foreign state. But if the corporation is incorporated in a State or foreign state, then it may also have a second place of citizenship: the State of its principal place of business. In contrast, if the corporation does not have a principal place of business, then it remains a citizen of only its State of incorporation. In other words, a corporation may be a citizen of its State of incorporation or a citizen of both its State of incorporation and its principal place of business, but it may never be a citizen of its principal place of business *without* a State of incorporation.

Assuming defendants could be understood to have advanced this argument below (or even in other sections of their appellate brief), we reject it now. This "two-step" reading defies any common understanding of the word *and*. And it runs into the same structural and contextual difficulties discussed above.

Supposedly, two categories of statutes create this problem. Defendants start by looking to special legislation that provides a fixed citizenship for certain federally chartered corporations. For instance, Congress deemed the National Railroad Passenger Corporation ("Amtrak") and the Telecommunications Development Fund citizens of the District of Columbia. *See* 49 U.S.C. § 24301(b); 12 U.S.C. § 2258.[12] But these statutes do not implicate the canon against surplusage (nor do they conflict with § 1332(c)(1)). They simply give a fixed, specific provision for D.C. citizenship, which controls over the dynamic, two-pronged, general rule in § 1332(c)(1). *See Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) ("'[T]he specific governs the general.'").

Similarly, no negative implication militates against Navy Federal's interpretation. Negative implication, also called the *expressio unius* canon, instructs that the "expressi[on] [of] one item of an associated group or series excludes another left unmentioned." *N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 933 (2017) (internal citations and alterations omitted). A fundamental premise of the *expression unius* canon is that the *unum* (the thing positively specified) can reasonably be thought to occupy the field. Scalia and Garner, *Reading Law*, at 107. But special legislation—affecting only specific corporations—has a narrow impact by design. *See Local and Special Legislation*, Black's Law Dictionary 1801 (11th ed. 2019). It does not exclude the application of a separate, general rule (like that in § 1332(c)(1)) to all others. The kindergarten teacher who specifically tells two children

---

[12] Congress has provided that the District of Columbia is a "State" for purposes of § 1332. 28 U.S.C. § 1332(e).

24

not to hit one another does not imply that all the others may engage in violence—particularly where a general school rule forbids fighting. So too here.

Defendants next call our attention to legislation that provides different rule-based mechanisms for determining the citizenships of certain federal entities.[13] These kinds of enactments govern the citizenship of entities such as national banks and federal savings associations. 28 U.S.C. § 1348 ("national banking associations" are "deemed citizens of the States in which they are respectively located"); 12 U.S.C. § 1464(x) (federal savings associations are citizens of the state where their "home office" is located). But again, these are different rules applicable to different entities, not surplusage. *See Wachovia Bank*, 546 U.S. at 317 n.9.[14] And these specific rules likely control over § 1332(c)(1)'s general provision. *See OneWest Bank, N.A. v. Melina*, 827 F.3d 214, 219 (2d Cir. 2016); *Rouse v. Wachovia Mortg., FSB*, 747 F.3d 707, 709 (9th Cir. 2014). *But see Flinn v. Santander Bank, N.A.*, 359 F. Supp. 3d 128, 132 n.2 (D. Mass. 2019).

---

[13] Note that federal law provides for chartering a variety of distinct financial entities—each with their own structure, requirements, and regulators. National banking associations (chartered by the Office of the Comptroller of the Currency) are thus distinct from federal credit unions (chartered by the NCUA), which are distinct from Farm Credit Banks (overseen by the Farm Credit Administration), and so on. *See generally* Marc Labonte, Congressional Research Service, *Who Regulates Whom? An Overview of the U.S. Financial Regulatory Framework* (2020).

[14] In *Hertz*, the Supreme Court explained that the "principal place of business" of a corporation is its actual headquarters—the "nerve center" of the corporation. 559 U.S. at 81. But national banking associations, "deemed citizens of the States in which they are respectively located," 28 U.S.C. § 1348, are "respectively located" based on where they have designated their "main office" in their articles of incorporation. *Wachovia Bank*, 546 U.S. at 318. This may or may not be the same location as the nerve center. *Id.* at 317 n.9.

Our circuit, however, has not yet definitively construed the relationship between the provisions cited by defendants and § 1332(c)(1). And we see no need to do so today. Assuming, for the sake of argument, that some surplusage would result from Navy Federal's reading of *and*, we would not reach defendants' conclusion. "The canon against surplusage is strongest when an interpretation would render superfluous another part of the *same statut*[*e*]." *Marx*, 568 U.S. at 386 (emphasis added). In contrast, "[r]edundancies *across* statutes are not unusual events in drafting." *Connecticut National Bank v. Germain*, 503 U.S. 249, 253 (1992) (emphasis added). Here, the other statutes that defendants highlight are just that—other statutes. So "the force of this canon is diminished," *Marx*, 538 U.S. at 386, and it would not prevail over the plain text of the statute, *see Connecticut Nat. Bank*, 503 U.S. at 253.

### 3. *Bankers' Trust* supports Navy Federal

Defendants also point to the Supreme Court's 1916 decision in *Bankers' Trust* as support for their interpretation. 241 U.S. 295. In that case, the Court concluded that a federally chartered railroad was not a citizen of any state. According to defendants, this conclusion shows that Congress, when it passed § 1332(c) forty-two years later, did not intend for that statute to apply to federal corporations. We disagree.

In *Bankers' Trust*, the Supreme Court considered whether federal courts had subject-matter jurisdiction over a suit to foreclose on a railroad mortgage. 241 U.S. at 301. There, a New York corporation brought state-law contract claims against the Texas & Pacific Railway Company, a federally chartered corporation, and the New Orleans Pacific Railway Company, a Louisiana corporation. *Id.* at 301–02. The Supreme Court began its

26

analysis by rejecting plaintiff's arguments that the district court possessed federal-question jurisdiction over the case by virtue of (1) the "sue and be sued" clause in Texas & Pacific Railway's federal charter and (2) the fact of its federal incorporation. *Id.* at 303–09 (discussing *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738 (1824), *Bank of United States v. Deveaux*, 9 U.S. (5 Cranch) 61 (1809), and § 5 of the Judiciary Act of 1915). Next, the Supreme Court turned to whether the federally chartered corporation was a citizen of Texas.

The Court evaluated three grounds for conferring state citizenship on Texas & Pacific Railway, but it rejected each. First, it considered the then-existing federal-common-law rule for determining corporate citizenship. *Id.* at 309. At that time, the federal common law generally presumed that a corporation possessed the citizenship of the State where it was incorporated. *See Marshall v. Baltimore & Ohio Railroad Co.*, 57 U.S. (16 How.) 314, 328–29 (1853); *see generally* Richard H. Fallon, et al., *Hart & Wechsler's The Federal Courts and the Federal System* 1430–32 (7th ed. 2015). But Texas & Pacific Railway "was incorporated under acts of Congress, not under state laws; and [so] its activities and operations were not to be confined to a single state." *Bankers' Tr.*, 241 U.S. at 309. Thus, the Court reasoned that because Texas & Pacific Railway was so incorporated, this common-law rule did not provide a basis for conferring State citizenship. *Id.*

Second, the Supreme Court considered whether there was a constitutional basis for conferring state citizenship on a federal corporation. The Court found none, explaining that the 14th Amendment "declares that native born and naturalized citizens of the United

27

States shall be citizens of the state wherein they reside," but that it says nothing about corporations. *Id.* at 310.

Last, the Court considered whether Congress had provided a statutory basis for jurisdiction "as is done in respect of national banks." *Id.* But finding none, the Court held that "there is no ground upon which the company can be deemed a citizen of Texas, and this being so, the suit is not one between citizens of different states." *Id.*

As defendants point out, several district courts—including in our Circuit—have relied on *Bankers' Trust* to find that federal corporations are not diverse under § 1332(c)(1). *See Hukic v. Aurora Loan Services*, 588 F.3d 420, 428 (7th Cir. 2009) (collecting cases).[15] These courts have generally read *Bankers' Trust* to hold "that a corporation chartered pursuant to an act of Congress was not a citizen of any state, and therefore was ineligible to invoke federal diversity jurisdiction." *Lehman Brothers Bank,*

---

[15] Defendants also assert that the Second, Eleventh, and Ninth Circuits have held that § 1332(c) does not apply to federally chartered corporations. Appellee Br. 18–19 n.58 (citing *OneWest Bank, N.A.*, 827 F.3d at 220; *Loyola Fed. Sav. Bank v. Fickling*, 58 F.3d 603 (11th Cir. 1995); *Hancock Fin. Corp. v. Fed. Sav. & Loan Ins. Corp.*, 492 F.2d 1325 (9th Cir. 1974)). We do not read the cited Second and Eleventh Circuit cases as defendants do.

In *One West*, the Second Circuit focused its interpretation on 28 U.S.C. § 1348, which provides a different rule establishing the citizenship of national banks. But to the extent that the specific controls the general, *One West* says nothing about the applicability of § 1332(c)(1) to federal corporations writ large. *See* 827 F.3d 218–19. In *Loyola*, the Eleventh Circuit applied the localization rule to confirm its subject-matter jurisdiction without discussing § 1332(c)(1). 58 F.3d at 606–07. Although we acknowledge the Ninth Circuit's ruling in *Hancock*, we note that the court never considered the text of § 1332(c)(1), relying instead on its purpose. *See* 492 F.2d at 1329 (quoting *Fed. Deposit Ins. Corp. v. Nat'l Sur. Corp.*, 345 F. Supp. 885, 888 (S.D. Iowa 1972)).

*FSB v. Frank T. Yoder Mortgage*, 415 F. Supp. 2d 636, 639 (E.D. Va. 2006); *see also Federal Deposit Insurance Corp.*, 345 F. Supp. at 887.[16] And some have suggested that a clear indication of Congressional intent would be required for § 1332(c)(1) to confer state citizenship to federally chartered corporations. *See Crum v. Veterans of Foreign Wars*, 502 F. Supp. 1377, 1380 (D. Del. 1980).

We take *Bankers' Trust* to stand for something different. *Bankers' Trust* teaches that we look to three sources to determine whether a corporation is diverse: the common law, the constitution, and the word of Congress. And based on an analysis of these sources, the Court reasoned that the federal corporation in that case was not diverse. By focusing on the conclusion and ignoring the reasons for the *Bankers' Trust* decision, we think the *Lehman Brothers* court (and others) misjudged the holding of *Bankers' Trust* and applied too blunt a rule. *See* Pierre N. Leval, *Judging Under the Constitution: Dicta about Dicta*, 81 N.Y.U. L. REV. 1249, 1256 (2006) (explaining that a holding "explains *why* the court's judgment goes in favor of the winner"); *id.* at n.20 ("It is only by reference to the court's reasoning that one can determine whether the factual differences between the earlier case and the later one should change the result.").

---

[16] Other courts have relied on the supposed Congressional "purpose" behind § 1332(c)(1) to reach their conclusion. *See Hancock Financial Corp.*, 492 F.2d at 1325 (quoting *Federal Deposit Ins. Corp.*, 345 F. Supp. at 888). Indeed, some make the legislative history of § 1332(c)(1) the starting point (and the focal point) of their analysis, which never reaches the provision's text. *See Northern Virginia Foot & Ankle Associates, LLC*, 2011 WL 280983, at *2–3. But we see no need to seek guidance in legislative history. As the Supreme Court recently affirmed, statutory interpretation must begin with the text, and it must end when the text resolves the case. *See, e.g.*, *Lomax*, 140 S. Ct. 1724–25.

Since *Bankers' Trust*, the final ground considered by the Court—whether Congress has spoken to the issue—changed. Forty-two years after that decision, Congress passed § 1332(c)(1), providing a general rule for determining the citizenship of a corporation. It was well within Congress' prerogative to do so: "'[w]hatever [the courts] say regarding the scope of [our] jurisdiction . . . can of course be changed by Congress." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 557 (2005) (quoting *Finley v. United States*, 490 U.S. 545, 556 (1989)); *United Steelworkers*, 382 U.S. at 153; *see also Federal Intermediate Credit Bank of Columbia, S.C., v. Mitchell*, 277 U.S. 213, 217 (1928). And, as we have explained, § 1332(c) plainly applies to federal corporations. "No sound canon of interpretation requires Congress to speak with extraordinary clarity in order to modify the rules of federal jurisdiction within appropriate constitutional bounds. Ordinary principles of statutory construction apply." *Exxon Mobil Corp.*, 545 U.S. at 558; *see also United States v. Texas*, 507 U.S. 529, 534 (1993) (internal citations omitted) ("Congress need not 'affirmatively proscribe' the common-law doctrine at issue."); *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 315 (1981) (same).[17]

For these reasons, we agree that the holding of *Bankers' Trust* supports Navy Federal's reading of § 1332(c)(1).

---

[17] We acknowledge that Congress should not be taken to overrule, sub silentio, statutory decisions of the Supreme Court. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 243 (2009); *see generally* William N. Eskridge, *Overruling Statutory Precedents* 76 GEO. L.J. 1361 (1987–88). For that, we may need a "clear expression . . . of Congress' intent." *Forest Grove*, 557 U.S. at 240. But *Bankers' Trust* did not turn on an interpretation of a statute. To the contrary, the Supreme Court expressly noted the *absence* of any statutory provision that would control its decision. 241 U.S. at 310. Thus we do not find any such statutory "clear statement" rule applicable here.

*       *       *

We think this a case that "begins, and pretty much ends, with [§ 1332(c)(1)'s text]." *Lomax*, 140 S. Ct. at 1724. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank*, 503 U.S. at 253–54. And § 1332(c)(1) says that "a corporation shall be deemed a citizen of . . . the State or foreign state where it has its principal place of business." Navy Federal Credit Union is a corporation. Its principal place of business is in Virginia. So we hold that Navy Federal is a citizen of Virginia.

REVERSED